IN THE UNITED STATES COURT OF FEDERAL CLAIMS
OFFICE OF SPECIAL MASTERS

|  |  |
|---|---|
| MARIA CORULLA, as the parent and natural guardian of N.J., a minor,<br><br>                   Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                   Respondent. | No. 16-88V<br>Special Master George L. Hastings<br>ECF |

**RESPONDENT'S RULE 4 REPORT**

On January 15, 2016, Maria Corulla ("petitioner") filed a petition on behalf of her minor child, N.J., for compensation ("Petition") under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. Section 300aa-1 to -34 ("the Vaccine Act" or "the Act"), as amended. Petitioner alleges that on January 16, 2013, N.J. received measles mumps rubella ("MMR"), Varivax, and Fluzone, and on February 19, 2013, N.J. received a second Fluzone vaccine and "subsequently suffered an encephalopathy and/or brain damage resulting in developmental delay and other disabilities requiring therapy." Petition at 2. The Petition further alleges that N.J.'s condition was "either caused-in-fact" by her received vaccinations, "or, in the alternative, significantly aggravated" by her receipt of the January 16, 2013, and February 19, 2013 vaccines. *Id.*

The facts of this case, as reflected in the petition and accompanying documents, have been reviewed by medical personnel of the Division of Injury Compensation Programs, Department of Health and Human Services. Their opinion is that this case is not appropriate for compensation under the terms of the Act. Notwithstanding N.J.'s diagnosis with autism spectrum disorder, there is no evidence in the medical records that she was ever diagnosed

with an encephalopathy. Autism spectrum disorder is not considered an acquired encephalopathy. The records support the conclusion that N.J.'s developmental delay and and/or brain damage requiring therapy are sequela of her autism spectrum diagnosis. There is no evidence that vaccines cause autism. On this record and to the extent that litigating petitioner's claim relies on evidence already considered and rejected in the omnibus autism proceedings (OAP), respondent requests that the special master require petitioner to show cause why her case should not be dismissed.[1]

## FACTUAL BACKGROUND

N.J. was born premature at 36 weeks, weighing 7 lbs., 11 oz. Pet. Ex. 6 at 2. N.J. was immediately transferred to the neonatal intensive care unit ("NICU") "for 14 days due to glucose issues, jaundice and feeding issues." Pet. Ex. 1 at 83. Petitioner had gestational diabetes while pregnant with N.J.. Pet. Ex. 2 at 9. The early notes from the NICU indicate concerns regarding N.J.'s risk for developmental delay from the time of her birth. Pet. Ex. 6 at 26, 27, 29, and 30.

At three months of age, N.J. had a cardiology evaluation for a heart murmur which was felt to be a functional [physiologically normal] murmur. Pet. Ex. 1 at 72. She was seen for regular check-ups at Island Pediatrics by her pediatrician, Brian McMahon, MD, without chronic medical issues. At her 12 month check-up, the limited developmental checklist indicated that N.J. drank from a cup, was able to say "dada" (but not "mama") and was able to stand but not walk. *Id.* at 13. N.J. was cruising. *Id.*

On January 16, 2013, N.J. was seen for her 15 month well-child visit. Pet. Ex. 1 at 16. During this visit, a limited developmental assessment (by checklist with items checked) indicated "drinks from a cup, says mama/dada, stands & pr walks [sic]" including a "few steps." *Id.* N.J. was given MMR, Varivax and Fluzone vaccines with a plan to return in one month for influenza vaccine #2. *Id.* at 4, 16.

---

[1] Respondent reserves the right to raise a reasonable basis challenge to attorneys' fees and costs incurred in further developing this case.

Six days later, on January 18, 2013, N.J. was seen in the emergency room for a "fever." Pet. Ex. 6 at 158. Triage notes indicated that the patient's mother stated "child had shots the other day, now has fever, drinking milk from bottle now, no respiratory distress." *Id.* at 161. Additional history indicated a fever for one day. *Id.* at 158. "Patient receive[d] immunizations 2 days ago [actually 6 days] including chicken pox, MMR, influenza per mother." *Id.* "Otherwise: (-) decreased alertness, (-) decreased activity, (-) decreased oral intake."[2] *Id.* On physical exam, "the child is in no distress and is interacting appropriately with caretaker, maintaining eye contact with examiner, drinking a bottle." *Id.* Glasgow Coma Scale [an indicator of level of consciousness] was normal at 15.[3] *Id.* at 152. Patient had a mild active cough. *Id.* Temperature was 101.4 rectally. *Id.* at 161. Following the administration of Tylenol, the patient on re-examination "appears well and remains alert and active" and was "smiling." *Id.* at 159. The impression of the attending physician was "fever secondary to immunization vs. bronchitis." *Id.* "The child has no evidence of meningeal irritation or any other life threatening infections at this time." *Id.* The discharge instructions to N.J.'s parents were to follow-up with her primary physician in 1-2 days, and to return to the emergency room for "any alteration in behavior at any time." *Id.*

On February 19, 2013, N.J. returned to the pediatrician's office to receive the second dose of influenza vaccine. Pet. Ex. 1 at 35.

Twenty-eight days later, on March 19, 2013, N.J. was evaluated in the emergency room because she "sounds congested while sleeping." Pet. Ex. 6 at 180. A review of systems noted no

---

[2] The HHS medical reviewer noted that this review of systems does not indicate any post-vaccination encephalopathic state.

[3] The HHS medical reviewer noted that this review of systems does not indicate any post-vaccination encephalopathic state.

decrease in alertness, activity or oral intake. *Id.* On exam, child "interacts appropriately for age." *Id.* The impression was nasal congestion.[4] *Id.*

Three months after receiving the second dose of the flu vaccine, on April 19, 2013, N.J. was seen for her 19-month check-up. Pet. Ex. 1 at 22. The history from this visit indicated that N.J. was seen "in [the] ER on April 5, 2013 for a virus—vomiting & diarrhea." *Id.* Her general appearance was good.[5] Developmental checklist had a handwritten "no" over "says mama/dada." *Id.* Patient was to be evaluated by speech and occupational therapy. *Id.*

On April 26, 2013, N.J. was evaluated "due to concerns with motor and speech and language development." Pet. Ex. 2 at 9. The records from this evaluation reflect that the evaluation was initiated by N.J.'s mother. *Id.* Petitioner reported that N.J. did not speak and when she does speak she babbles." *Id.* The medical record from this visit indicates that the "[f]amilial history of developmental delay is positive, as [four] of [N.J.'s] uncles suffer from autism or other delays. Additionally, mother has [two] first cousins with autism." *Id.* at 11. N.J.'s evaluation was done by a developmental evaluator, a speech-language pathologist, a physical therapist, and an occupational therapist. *Id.*

The history taken by the speech therapist noted that "[a]ccording to [petitioner], speech-language milestones included babbling prior to 12 months of age. The production of [N.J's] first true word emerged [sic] has not emerged, however, it was "stated that [N.J.] produces 'gibberish' with change[s] in her tone." Pet. Ex. 2 at 27. A main concern, as reported by petitioner, is that N.J. "does not appear to use the productions 'mama' and 'dada' meaningfully for her parents, although she does repetitively babble these sounds during the day." *Id.* N.J.'s evaluation

---

[4] This presentation is not consistent with an encephalopathic picture.

[5] According to the HHS medical reviewer, there was no evidence of any ongoing encephalopathic features.

revealed significant communication, fine motor and gross motor delays, which qualified her for an early intervention program.  *Id.* at 13.

Approximately two weeks later, on May 10, 2013, a Child & Adolescent Health Examination Form completed by Dr. McMahon, indicated normal "psychosocial development, language, behavior" and development "within normal limits."  Pet. Ex. 1 at 70.[6]

On May 30, 3013, N.J. was evaluated by an orthopedist John L'Insalata, M.D., regarding her intoeing and bowing of legs.  Pet. Ex. 1 at 66.  His assessment was that lower extremity findings were likely physiologic and should improve with time.  *Id.*

On July 9, 2013, N.J. was seen by a social worker, Deborah Holly, for supplemental psychological evaluations including Bayley Scales, Battelle Developmental Inventory, and Childhood Autism Rating Scale.  Pet. Ex. 1 at 83.  "Ms. Corulla described some restricted, repetitive and stereotyped patterns of behavior, interests and activities."  *Id.*  N.J. was currently receiving early intervention services to address developmental delays.[7]  *Id.*  Per the patient's mother, the patient's "physical developmental milestones were achieved late including first walking at approximately 15 months."  *Id.*  During this assessment, "concerns regarding [N.J.'s] communication skills were reported."  *Id.*  The record from the assessment reflects that "N.J. said a few words at approximately 12 months old[;] however, she stopped talking at that time following a vaccine and a high fever."  *Id.*  She did not respond to her name and did not appear to understand words.  *Id.*  N.J. "does not interact with other children."  *Id.* at 84.  N.J. "exhibits a variety of repetitive behaviors including twirling in circles, flapping her hands, pressing buttons,

---

[6] The documentation of development by Dr. McMahon was quite limited, and consists of a checked box reflecting that N.J. was developing within normal limits.  This form, completed on May 10, 2013, contradicts concerns mentioned in the April 10, 2013 visit at which there were notations that the patient was to be evaluated by speech and occupational therapy.

[7] Respondent notes that the records from these visits have not been provided.

and opening and closing doors and draw[er]s." *Id.*  Results of testing indicated "significant delays in [N.J.'s] cognitive functioning, communication skills and social-emotional functioning" and "mild-to-moderate symptoms of Autism Spectrum Disorder." *Id.* at 85.  Special instruction and continued early intervention services were recommended. *Id.*

Six months after N.J. received the first vaccines at issue, on July 16, 2013, she presented to the pediatrician with a rash.  Pet. Ex. 1 at 35.  The record from this visit notes that N.J. had pervasive developmental delay ("PDD"). *Id.*

On September 11, 2013, N.J. again presented to the pediatrician in follow-up to an emergency room visit.  Pet. Ex. 1 at 36.  The history from this visit indicated that the week before, N.J. had lost her balance and hit a TV stand. *Id.*  The CT scan was "clear." *Id.*  There was a notation of "concussion." *Id.*

On September 24, 2013, N.J. returned to the pediatrician for her two-year well-child-check.  Pet. Ex. 1 at 14.  The history from this visit indicated that N.J. was "not speaking—in therapy points to things." *Id.*  The notes reflect that N.J. was receiving multiple therapies including speech, occupational, physical, and applied behavioral analysis[8] ("ABA"). *Id.*

On November 25, 2013, N.J. was again seen by her pediatrician in follow-up for an emergency room visit.  Pet. Ex. 1 at 37.  The notes from this visit indicate that N.J. had been taken to the ER the previous evening with "Severe diarrhea[,] High fever, 101.1[,] Swollen tonsils." *Id.*  She had a rash on her body and she was on Augmentin. *Id.*  Impression was "acute gastroenteritis without dehydration." *Id.*

---

[8] According to the HHS reviewer, ABA refers to applied behavioral analysis, which involves interventions designed to improve socially significant behaviors.  It is used to assist children with autism.

On September 23, 2014, N.J. was seen for her three-year well-child check at her pediatrician. The history [much of which is illegible] indicated that she was diagnosed with "ASD." Pet. Ex. 1 at 15. Speech, occupational, physical, and ABA therapies were continuing. *Id.* Assessment was "Well-child; Autism." *Id.* N.J. was given the FluMist vaccination.[9] *Id.* at 4, 18, 41.

A letter dated May 29, 2015, from the New York City Administration for Children's Services to Island Pediatrics reflects that "[w]e are currently conducting an investigation regarding a child maltreatment report."[10] Pet. Ex. 1 at 59. The response by the pediatric practice indicated that N.J. had been under the care of Island Pediatrics since October 5, 2011, and carried the diagnoses of "viral illness, eczema, [and] autism." *Id.* at 60. At that time, N.J. continued to receive ABA, speech, occupational, and physical therapies.

On September 3, 2015, Dr. McMahon authored a "To Whom It May Concern" letter indicating that N.J. "is lactose intoleran[t] and needs lactaid milk and because she is nonverbal cannot have peanuts, nuts, honey and fish." Pet. Ex. 1 at 56.

On September 21, 2015, N.J. was seen at Island Pediatrics for "acute conjunctivitis." Pet. Ex. 1 at 46. She was given a FluMist vaccination. Pet. Ex. 1 at 46.

On September 25, 2015, N.J. returned for her four-year well-child check. Pet. Ex. 1 at 24. The developmental checklist indicated that N.J. knew her first and last names, walked upstairs not holding on, understood what to do when tired, cold and hungry, but did not play interactive games and was not toilet-trained at night. *Id.* She was also unable to button her shirt and unable to copy simple pictures and lines. *Id.*

---

[9] Of note, although petitioner alleges that the influenza vaccines played a causative role, N.J. continued to receive influenza vaccines without any apparent developmental regression.

[10] There was no mention of any specifics that led to the maltreatment report.

On October 5, 2015, a "Refusal to Vaccinate" form was submitted for N.J. on which petitioner had indicated a decision to decline a Varivax vaccine and possibly an MMR vaccine ("Mom waiting"). Pet. Ex. 1 at 30.

## DISCUSSION

As a preliminary matter, petitioner must demonstrate that N.J. suffered from an acquired encephalopathy, her alleged vaccine injury. *Broekelshen v. Sec'y of HHS*, 618 F.3d 1339, 1346 (Fed. Cir. 2010) (affirming a special master's decision to determine which condition petitioner suffered from before conducting an analysis of the *Althen* factors.). Petitioner has not established by preponderant evidence the specific nature of N.J.'s injury. Notably, none of N.J.'s treating physicians have diagnosed her with an encephalopathy. N.J. has been diagnosed with autism spectrum disorder. Pet. Ex. 1 at 85.

Under the Vaccine Act, as a matter of law, there are two methods by which petitioner may demonstrate entitlement for an award of compensation. Petitioner may show either that N.J. suffered an injury listed on the Vaccine Injury Table ("Table") within the requisite time period covered by the Table, in which case causation is presumed, or that her medical condition was caused-in-fact or significantly aggravated by a vaccine. 42 U.S.C. § 300aa-11(c)(1)(C). Petitioner does not allege that N.J. suffered a Table injury, nor do the records support such an allegation. Accordingly, petitioner is not entitled to a presumption of vaccine causation and must proceed on a theory of causation-in-fact. Under this approach, petitioner must provide preponderant evidence to support her case of vaccine causation, including:

> (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Moberly v. HHS*, 592 F.3d 1315, 1322 (Fed. Cir. 2010) (quoting *Althen v. HHS*, 418 F.3d 1274, 1278 (Fed. Cir. 2005)).  Moreover, there must be preponderant evidence "that the vaccine, and not some other agent, was the actual cause of the injury."  *Munn v. HHS*, 970 F.2d 863, 865 (Fed. Cir. 1992).  In this case, petitioner has not offered a reputable medical or scientific theory showing that N.J.'s January 16, 2013, and February 19, 2013 vaccinations could cause an encephalopathy, or any other complaint that appears in N.J.'s records.  The records also do not establish a logical sequence of cause and effect between the received vaccines and N.J.'s condition.  Finally, petitioner has not met her burden of establishing the existence of a medically acceptable temporal association between the received vaccinations and the onset of N.J.'s alleged encephalopathic condition.  It is petitioner's burden to establish both what the appropriate time frame for onset of N.J.'s condition would be if the vaccine was the cause, and when the onset of these problems actually occurred.  *See de Bazan v. HHS*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).

In the event of future proceedings, petitioner will have to address whether N.J.'s genetic predisposition and strong familial history for autism, referenced repeatedly and in her earliest medical records, had any role in the etiology of her condition.  That is, in order for petitioner in this case to successfully prove that the vaccine was the most likely cause of N.J.'s condition, she must demonstrate that other causes are less likely.  *Munn v. HHS*, 970 F.2d 863, 865 (Fed. Cir. 1992) ("The claimant must prove by a preponderance of the evidence that the vaccine, and not some other agent, was the actual cause of the injury."); *Pafford v. HHS*, 64 Fed. Cl. 19, 35 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006) ("the attendant burden of proof in an actual causation case subsumes the obligation to successfully eliminate potential alternative causes of the alleged injury that have been identified in the record."); *but see Walther v. HHS*, 485 F.3d 1146, 1149-50 (Fed. Cir. 2007) ("While our recent decision in *Pafford* held that a petitioner as a

practical matter may be required to eliminate potential alternative causes where the petitioner's other evidence on causation is insufficient, we conclude that the Vaccine Act does not require the petitioners to bear the burden of eliminating alternative causes where the other evidence on causation is sufficient to establish a prima facie case.") (citations omitted).

Petitioner also alleges that N.J.'s January 16, 2013 and February 19, 2013 vaccinations significantly aggravated N.J.'s condition (Petition at 1), but petitioner has not presented a plausible claim of significant aggravation. *See Loving v. HHS*, 86 Fed. Cl. 135, 144 (2009).

## CONCLUSION

Congress authorized the Vaccine Program to compensate only those individuals who can substantiate their claims either through a presumption of causation (i.e., proof of a Table case) or by proving a causal link between the alleged injuries and a covered vaccine. The evidence does not support a table injury, and petitioner has failed to prove any causal link between N.J.'s vaccinations and her subsequent alleged injuries. As a result, petitioner has not met her *prima facie* burden to show causation-in-fact, and this case should be dismissed.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

RUPA BHATTACHARYYA
Director
Torts Branch, Civil Division

VINCENT J. MATANOSKI
Deputy Director
Torts Branch, Civil Division

GLENN A. MACLEOD
Senior Trial Counsel
Torts Branch, Civil Division

|  |  |
|---|---|
|  | s/Camille M. Collett |
|  | CAMILLE M. COLLETT |
|  | Trial Attorney |
|  | Torts Branch, Civil Division |
|  | U.S. Department of Justice |
|  | P.O. Box 146 |
|  | Benjamin Franklin Station |
|  | Washington, D.C. 20044-0146 |
| Dated: May 9, 2016 | Telephone: (202) 616-4098 |